# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY,<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 04780 |
| ASSURED GUARANTY CORP.; ASSURED GUARANTY MUNICIPAL CORP.; THE AD HOC GROUP OF PREPA BONDHOLDERS[1]; NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION; AND SYNCORA GUARANTEE INC.,<br><br>Plaintiffs,<br><br>v.<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY; FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO; PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY; NELSON MORALES RIVERA; AND JOSE ROQUE TORRES,<br><br>Defendants. | Adversary Proceeding<br><br>No. 17-_____ |

## ADVERSARY COMPLAINT

Plaintiffs Assured Guaranty Corp. ("AGC") and Assured Guaranty Municipal Corp., f/k/a Financial Security Assurance Inc. ("AGM" and together with AGC, "Assured"), National Public Finance Guarantee Corporation ("National"), the Ad Hoc Group of PREPA

---

[1]   Those members of the Ad Hoc Group consist of certain funds and accounts managed or advised by Angelo, Gordon & Co., L.P.; BlueMountain Capital Management, LLC; Franklin Advisers, Inc.; Knighthead Capital Management, LLC; Marathon Asset Management, LP; and OppenheimerFunds, Inc. Exhibit A attached hereto sets forth the specific funds and accounts and the place of incorporation of each fund or account.

Bondholders (the "Ad Hoc Group"), and Syncora Guarantee Inc. ("Syncora"), (collectively, the "Plaintiffs"), for their Complaint against defendants Puerto Rico Electric Power Authority ("PREPA"), the Financial Oversight and Management Board ("Oversight Board"), and the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), Nelson Morales Rivera, and Jose Roque Torres ("Treasurer"), (collectively, the "Defendants"), allege as follows:

## NATURE OF THIS ADVERSARY PROCEEDING

1.      This action is one to enforce Plaintiffs' contractual interest and constitutional right to revenues that PREPA pledged to bondholders but has thus far refused to turn over.  Plaintiffs' right to this collateral is preserved during this Title III case because PROMESA (as defined below) incorporates sections of the Bankruptcy Code enacted to protect creditors' interests in these types of pledged revenues during a municipal bankruptcy case.  In an effort to seek consensual resolution of PREPA's obligations under PROMESA, by letter dated July 19, 2017, Plaintiffs requested that Defendants propose a form of suitable security for the pledged revenues.  Rather than respond to that request in substance, Defendants have taken extreme positions in PREPA's Title III case with respect to the bondholders' collateral.  Consequently, Plaintiffs have been forced to file this Complaint to compel PREPA to turn over its pledged revenues to the Trustee (as defined below) as required by law.

2.      Plaintiffs hold and/or insure approximately 65% of limited recourse revenue bonds issued by Defendant PREPA (the "Bonds").  The Bonds are secured by a pledge of all current and future revenues, receipts, and other income derived by PREPA from the sale or distribution of electricity using its System as more specifically described in the Trust Agreement (as defined below) (collectively, the "Revenues").

3.     Since August 2014, PREPA has failed to comply with its affirmative obligations to turn over Revenues from the General Fund to the Sinking Fund, as required under the Trust Agreement dated as of January 1, 1974 (as amended and supplemented, the "Trust Agreement")[2] between PREPA and U.S. Bank National Association, as trustee (solely in that capacity, the "Trustee").   Pursuant to the restructuring support agreement among PREPA, AAFAF, Plaintiffs and certain other parties (as supplemented, the "RSA"), and a series of coterminus amendments to the Trust Agreement, Plaintiffs agreed to temporarily suspend certain contractual obligations of PREPA to remit Revenues to the Sinking Fund and to temporarily forbear from exercising certain remedies against PREPA.   The RSA (and corresponding amendments to the Trust Agreement) terminated on June 29, 2017 as a result of the Oversight Board's refusal to certify the RSA under section 601(g)(2)(B) of the Puerto Rico Oversight, Management, and Economic Stability Act of 2016 ("PROMESA").

4.     PREPA's obligation to transfer Revenues to the Sinking Fund resumed upon termination of the RSA and the expiration of temporary forbearing amendments to the Trust Agreement.  On a monthly basis, PREPA is required under the Trust Agreement to transfer Revenues from its General Fund to the Revenue Fund and from there to the Sinking Fund held by the Trustee.  PREPA has willfully refused to confirm that it intends to comply with that obligation.  Despite having over $532.6 million of Revenues in its General Fund as of June 23, 2017, PREPA is brazenly ignoring its contractual obligation to remit Revenues to the Sinking Fund.

5.     In enacting PROMESA, Congress incorporated the special revenue protections of the Bankruptcy Code (11 U.S.C. §§ 902, 922(d), and 928(a)) into Title III of

---

[2]   Capitalized terms used and not otherwise defined have the meanings given to them in the Trust Agreement.

PROMESA.  *See* 48 U.S.C. § 2161.  These protections guarantee that revenue bondholders, such as Plaintiffs, receive the benefit of their bargain by protecting the lien on postpetition revenues, and by ensuring the uninterrupted application of the pledged revenues to the timely payment of debt service on their bonds without interference from the automatic stay.  Moreover, these provisions specifically restrict a debtor's ability to use pledged special revenues during a bankruptcy case.

6.     The Bonds are secured by a lien on "special revenues" as defined in section 902 of the Bankruptcy Code, and are therefore entitled to the benefits of the special revenue protections in PREPA's Title III case.  Defendants' failure to remit such revenues to the Revenue Fund and the Sinking Fund on July 15, 2017 and July 25, 2017 and each month thereafter directly violates these special revenue protections.   Accordingly, through this adversary proceeding, Plaintiffs seek a declaration that Defendants have violated sections 922(d) and 928(a) of the Bankruptcy Code, and that efforts to compel Defendants to apply such revenues to pay for debt service on the Bonds are not stayed as provided under section 922(d) of the Bankruptcy Code.

7.     Plaintiffs also seek a declaration that, pursuant to sections 922(d) and 928 of the Bankruptcy Code as incorporated into PROMESA, PREPA is only authorized to use Revenues to pay for current operating expenses in the current time period, not for future expenses that may be deferred to or payable at a later date.  Such expenses must be itemized and the debtor bears the burden of establishing that each expense is a necessary operating expense currently due in that time period.  The Trust Agreement and the Bankruptcy Code do not permit PREPA to prioritize all expenses over debt service on the Bonds and expressly proscribe any capital expenditures or expenses that otherwise fail to qualify as current and necessary operating expenses.  Plaintiffs seek the establishment of procedures that will enable them and the Trustee

to review and resolve any disputes with respect to any expenses that the Defendants seek to prioritize over debt service on the Bonds.

8.      In addition to violating the Bankruptcy Code for the reasons stated above, the withholding of Revenues for expenses that do not constitute current and necessary operating expenses violates the Constitution of the United States (the "U.S. Constitution") by depriving Plaintiffs and other bondholders of property without just compensation or due process of law.

9.      In addition to declaratory relief, Plaintiffs also seek injunctive relief prohibiting Defendants from taking or causing to be taken any action that would further violate sections 922(d) and 928(a) of the Bankruptcy Code and ordering Defendants to remit Revenues for the uninterrupted and timely payment of debt service on the Bonds in accordance with sections 922(d) and 928(a) of the Bankruptcy Code.

## **THE PARTIES**

10.      Plaintiffs AGC and AGM are, respectively, Maryland and New York insurance companies that guarantee payment of principal and interest when due on certain of the Bonds.  Assured insures approximately $805 million of Bonds and owns approximately $42 million (exclusive of accrued and accreted interest) of uninsured Bonds.  In addition, on July 3, 2017, Assured paid approximately $19.9 million on account of Bonds and interest rate swaps that it insured, and is therefore subrogated to the rights of PREPA bondholders and the swap counterparties.

11.      Plaintiff National is a New York insurance company that guarantees payment of principal and interest when due on certain of the Bonds.  National insures approximately $1.15 billion of Bonds and also owns approximately $139 million (exclusive of accrued and accreted interest) of uninsured Bonds.  In addition, National owns approximately

$95 million of principal amount of Bonds and rights to receive payment thereunder on account of claims paid to holders of such Bonds under National's insurance policies.

12.    Plaintiff Syncora is a New York insurance company that guarantees payment of principal and interest when due on certain of the Bonds.  Syncora insures approximately $126.2 million of Bonds and also owns approximately $38.5 million (exclusive of accrued and accreted interest) of uninsured Bonds.  In addition, Syncora owns approximately $42.1 million of Bonds and rights to receive payment thereunder on account of claims paid to holders of such Bonds under Syncora's insurance policies.

13.    Plaintiffs also include members of the Ad Hoc Group who collectively hold over $3 billion of uninsured Bonds (exclusive of accrued and accreted interest).  Those members of the Ad Hoc Group consist of certain funds and accounts managed or advised by Angelo, Gordon & Co., L.P.; BlueMountain Capital Management, LLC; Franklin Advisers, Inc.; Knighthead Capital Management, LLC; Marathon Asset Management, LP; and OppenheimerFunds, Inc. Exhibit A hereto sets forth the specific funds and accounts and the place of incorporation of each fund or account.

14.    Defendant Oversight Board was established under Section 101(b)(1) of PROMESA (48 U.S.C. § 2121(b)(1)) as an "entity within the [Commonwealth] government." Id. § 2121(c)(1).

15.    Defendant AAFAF is a public corporation organized under the laws of the Commonwealth, and granted powers under Act No. 2-2017 to act as fiscal agent to Puerto Rico's instrumentalities and the power to oversee all restructuring and adjustment of any existing debt obligations.

16.    Defendant PREPA is a public corporation organized under the laws of the Commonwealth.

17.     Defendant Nelson Morales Rivera is the Director of Finances of PREPA, who is empowered to perform and oversee functions of the Treasurer, including representing PREPA in transactions with the Trustee, and for other Bond negotiations.  Plaintiffs sue the Director of Finances of PREPA, and any successors thereto, in his official capacity.

18.     Defendant Jose A. Roque Torres is the Treasurer of PREPA.  Plaintiffs sue the Treasurer, and any successors thereto, in his official capacity.

## JURISDICTION, VENUE AND STANDING

19.     This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under PROMESA.   In addition, this Court has jurisdiction under section 106(a) of PROMESA, which grants jurisdiction to this Court over "any action against the Oversight Board, and any action otherwise arising out of [PROMESA], in whole or in part." 48 U.S.C. § 2126(a).  Further, this Court has jurisdiction under section 306(a) of PROMESA, which grants this Court original and exclusive jurisdiction of all cases under Title III of PROMESA and original jurisdiction of all civil proceedings arising under Title III of PROMESA or arising in or related to cases under Title III of PROMESA.  Id. § 2166(a)(2).

20.     This Court has personal jurisdiction over all Defendants pursuant to section 306(c) of PROMESA.  48 U.S.C. § 2166(c).

21.     Plaintiffs seek a declaration and related relief in this case of actual controversy pursuant to 28 U.S.C. §§ 2201 and 2202.  An actual and justiciable controversy has arisen and exists between the parties with respect to the issues and claims alleged herein.

22.     This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure and section 310 of PROMESA, which provides "[t]he Federal Rules of Bankruptcy Procedure shall apply to a case under [Title III of PROMESA] and to all

civil proceedings arising in or related to cases under [Title III of PROMESA]."   48 U.S.C. § 2170; Fed. R. Bankr. P. 7001.

23.     Venue is proper in this District under section 307 of PROMESA. 48 U.S.C. § 2167.

24.     Plaintiffs have standing to bring this adversary proceeding, including as parties in interest in PREPA's Title III case.  Plaintiffs also have standing because they directly hold and/or insure Bonds issued by PREPA, and as a result of Defendants' failure to remit Revenues in accordance with the Trust Agreement, PREPA defaulted on principal and interest payments due to Plaintiffs on account of Bonds that they hold and/or insure.   Moreover, Plaintiffs have standing to bring this action directly in their own names under the terms of the Trust Agreement.

25.     As Section 301(c)(3)(B) of PROMESA expressly recognizes, financial guaranty insurers, such as Plaintiffs Assured, National, and Syncora, are authorized to act on behalf of the holders of the bonds they insure, including in litigation generally, in PREPA's Title III case, and in this adversary proceeding, and such Plaintiffs' rights to act on behalf of PREPA bondholders is not dependent upon a default or subrogation.  48 U.S.C. § 2161(c)(3)(B).

26.     In addition, however, Plaintiffs Assured, National, and Syncora have been subrogated to the rights of certain PREPA bondholders, which rights have been assigned to such Plaintiffs, upon paying the claims of such PREPA bondholders following a payment default by PREPA on July 3, 2017.

27.     Payment by such Plaintiffs neither satisfies nor discharges an issuer's obligation to pay and, to the extent that such Plaintiffs make principal or interest payments to bondholders, such Plaintiffs obtain assignments of rights from the bondholders, become the

owner of the bonds, or become subrogated to the rights of bondholders and effectively step into the shoes of such bondholders.

28.     Plaintiffs have no adequate remedy at law against Defendants, and therefore ask this Court to award the requested declaratory and injunctive relief to prevent an unconstitutional taking of Plaintiffs' collateral.

**FACTS**

**I.     The PREPA Bonds**

29.     PREPA was created as a public corporation on May 2, 1941 pursuant to Act No. 83-1941 of the Legislative Assembly of Puerto Rico, P.R. Laws Ann. tit. 22 §§ 191, *et seq.* (as amended, reenacted and supplemented, the "Enabling Act").   As a public corporation, PREPA has "legal existence and personality separate and apart from that of" the Commonwealth. 22 L.P.R.A. § 193(b).   Among other things, the Enabling Act provides that PREPA has the power to "sue and be sued," "make contracts and to execute all instruments necessary or convenient in the exercise of any of its powers," and to issue bonds. *Id.* § 196.

30.     Pursuant to the powers granted to it under the Enabling Act, PREPA issued Bonds under the Trust Agreement.   A true and correct copy of the Trust Agreement is attached as Exhibit B hereto.   Approximately $8.3 billion of Bonds remain  outstanding.

31.     Pursuant to the Enabling Act, PREPA executed and delivered the Trust Agreement to the original trustee, expressly stating in the granting clause thereof that:

> in order to secure the payment of all bonds at any time issued and outstanding hereunder…and in order to secure the performance and observance of all covenants, agreements, and conditions… [PREPA] has pledged and does hereby pledge to the Trustee the revenues of the System…and other moneys to the extent provided in this Agreement as security for the payment of the bonds and the interest and redemption premium, if any, thereon and as security

> for the satisfaction of any other obligation assumed by it in connection with such bonds[.]

Ex. B (Trust Agreement) at 11-12; *see also id.* § 701 (providing that the Bonds are "payable solely from the Revenues and said Revenues are hereby pledged to the payment thereof"). Under the Trust Agreement, PREPA pledged ***all*** Revenues of the System to secure payment of the Bonds, as well as the performance of all of PREPA's obligations thereunder. *See* Ex. B (Trust Agreement) at 11-12.

32.     As defined in the Trust Agreement, "Revenues" means, among other things:

> all moneys received by the Authority in connection with or as a result of its ownership or operation of the System,[3] including the income derived by the Authority from the sale of electricity generated or distributed by the System, any proceeds of use and occupancy insurance on the System or any part thereof and income from investments made under the provisions of . . . this Agreement.

Ex. B (Trust Agreement) § 101.

## II.     The Collateral Package:   Pledged Revenues, The Rate Covenant, And The Commitment To Collect

33.     Unlike financings for privately owned utilities, holders of revenue bonds in public utility financings generally are secured solely by a pledge of revenues of the utility after payment of current operating expenses and have no recourse to or mortgage or other lien on physical assets. This is because the laws of most U.S. states and territories (including Puerto

---

3     The Trust Agreement defines "System" to mean "all the properties presently owned and operated by the Authority as a single integrated system, together with all works and properties which may be hereafter acquired or constructed by the Authority in connection with the production, distribution or sale of electric energy and the acquisition or construction of which shall be financed in whole or in part from the proceeds" of Bonds.  Ex. B (Trust Agreement) § 101.

Rico) restrict public utilities from pledging physical assets as collateral for financial obligations. 22 L.P.R.A. § 206.[4]

34.     To create marketable securities for revenue bonds notwithstanding the restrictions on recourse to and mortgage or other lien on physical assets, such bonds are generally also secured by a covenant to maintain and collect rates and charges at a level sufficient to cover debt service, which ensures that bondholders will not be adversely impacted by increases in the amount of operating expenses due to inflation or otherwise.  This rate covenant gives bondholders the unimpaired right to the revenues pledged to them and is therefore a necessary part of the collateral package.  Without a rate covenant, bondholder collateral would be diminished each year solely by an increase in operating expenses.  Thus, revenue bonds of public utilities (including the Bonds) are typically secured by (i) a lien on revenues generated by the utility system, (ii) a covenant that the utility will maintain and collect rates and charges at a level sufficient to cover debt service, and (iii) the right to require a court of competent jurisdiction to appoint a receiver if the utility is in default.

35.     These statutory and contractual provisions operate together to give creditors a collateral package that is the equivalent of a full recourse obligation that is secured by a mortgage or other lien on the physical assets.  Notably, in enacting the special revenue provisions in 1988, Congress specifically sought to provide limited recourse revenue bondholders "a recognition of a hypothetical mortgage from which revenues are derived where a real mortgage cannot be created either for legal reasons or because of compelling consideration of public policy."  S. Rep. No. 100-506, at 13 (1988).

---

[4]     *See, e.g.*, *In re Jefferson Cty., Ala.*, 474 B.R. 228, 238-39 (Bankr. N.D. Ala. 2012) ("[M]any states do not allow municipalities to encumber their properties with liens that could be enforced by foreclosure or repossession of the properties.").

36.     As part of the collateral package for the Bonds, PREPA entered into a binding commitment, set forth under the Trust Agreement and supported by the Enabling Act, to "fix, charge and collect reasonable rates and charges" and "adjust such rates and charges so that Revenues will at all times be sufficient" to pay the "Current Expenses of the System" and cover 120% of "the aggregate Principal and Interest Requirements for the next fiscal year" on account of the Bonds (the "Rate Covenant").  Ex. B (Trust Agreement) § 502.

37.     This portion of the collateral package is supported through power expressly granted to PREPA under section 6(*l*) of the Enabling Act, which grants PREPA:

> all rights and powers necessary and convenient to," among other things, "determine, fix, alter, charge, and collect reasonable and just rates, fees, rents, and other charges subject to the [Energy] Commission's approval . . . for electric power services . . . that are sufficient . . . for the payment of the principal of and interest on its bonds, and for fulfilling the terms and provisions of such agreements entered into with or for the benefit of purchasers or holders of any bonds of the Authority and other creditors.

22 L.P.R.A. § 196(*l*), *amended by* Act No. 4-2016 § 8.

38.     In 2014, the Enabling Act was amended to create the Puerto Rico Energy Commission (the "Energy Commission"), which is charged with reviewing and approving electric rates.  *See generally* Act No. 57-2014, codified at 22 L.P.R.A. § 1054(b).  However, the Enabling Act carefully ensures that the Energy Commission does not undermine PREPA's obligation to charge adequate rates; it requires that the Energy Commission approve a rate that "(i) is sufficient to guarantee the payment of principal, interest, reserves, and all other requirements of bonds . . . [and] (ii) complies with the terms and provisions of the agreements

entered into with or in benefit of buyers or holders of any bonds[.]"  Enabling Act Act § 6A(c), *amended by* Act No. 4-2016 § 9; Enabling Act § 6.25A(b), *amended by* Act No. 4-2016 § 18.[5]

39.     PREPA bondholders' collateral thus includes the pledge of current and future revenues and the right to have rates and charges set at levels sufficient to guarantee payment of debt service on the Bonds, payments into reserves under the Trust Agreement, and payment of all other financial obligations of PREPA.

40.     PREPA bondholders' collateral includes and is further supported by a binding commitment by PREPA to "continue to render bills for the services and facilities furnished by the System on a monthly or bi-monthly basis until such time as the Authority shall deem it advisable to change the period covered by such bills, and that it will establish and enforce reasonable regulations in relation to the collection of such bills."   Ex. B (Trust Agreement) § 501.  Thus, not only are the Bonds secured by the Rate Covenant, they are also secured by the binding commitment of PREPA to collect its bills.

41.     To enforce their rights, PREPA bondholders holding at least twenty-five percent of the principal amount of Bonds outstanding have the direct statutory right to require the appointment of a receiver following an event of default.  Plaintiffs have petitioned the court to lift the automatic stay to enforce that right.  *See* Dkt. No. 74.[6]

## III.     The Flow Of Funds Under The Trust Agreement

42.     As provided under the Trust Agreement, PREPA collects Revenues and deposits them as received into an account known as the General Fund, which it is required to

---

[5]     Under the Trust Agreement, bondholders originally had the right to compel enforcement of the Rate Covenant themselves.  Following the passage of Act No. 57-2014, all rate increases must be approved by the Energy Commission.  The vast majority of Bonds were issued and insured prior to the enactment of Act No. 57-2014, when PREPA had the unilateral right to increase rates.

[6]     Docket numbers referred to herein are references to PREPA's Title III case, Case No. 17-4780, unless otherwise indicated.

hold in trust in a segregated account at a qualified Depository.  *See* Ex. B (Trust Agreement)

§§ 505, 601.  PREPA is permitted to use moneys in the General Fund only to pay for Current

Expenses, and only to the extent that such expenses do "not exceed an amount which is

reasonable and necessary for maintaining, repairing and operating the System in an efficient and

economical manner[.]"  *Id.* § 505.  Further, the total amount of Current Expenses in any given

fiscal year shall not exceed amounts budgeted for that fiscal year.  *Id.*

43.     The Trust Agreement defines Current Expenses as:

the Authority's ***reasonable and necessary current expenses of
maintaining, repairing and operating the System*** and shall
include, without limiting the generality of the foregoing, all
administrative expenses, insurance premiums, expenses of
preliminary surveys ***not chargeable to Capital Expenditures***,
engineering expenses relating to operation and maintenance, fees
and expenses of the Trustee, the 1947 Trustee, the Paying Agents
and of the paying agents under the 1947 Indenture, legal expenses,
any payment to pension or retirement funds, and all other expenses
required to be paid by the Authority under the provisions of the
1947 Indenture, this Agreement or by law, or permitted by
standard practices for public utility systems, similar to the
properties and business of the Authority and applicable in the
circumstances ***but shall not include any deposits to the credit of
the Sinking Fund, the Reserve Maintenance Fund, the
Subordinate Obligations Fund, the Self-insurance Fund and the
Capital Improvement Fund or the 1947 Sinking Fund or deposits
under the provisions of Sections 511, 512 and 513 of the 1947
Indenture.***[7]

Ex. B (Trust Agreement) § 101 (emphasis added).

44.     After payment of the prescribed universe of current operating expenses as

set forth in section 505 of the Trust Agreement, the Treasurer is required to transfer the

remaining Revenues from the General Fund to  the Revenue Fund on or before the 15th day of

---

[7]     The 1947 Indenture was released in June 1996.

each month.[8]  Trust Agreement § 506.  Upon information and belief, on or prior to July 15, 2017,
PREPA failed to transfer Revenues from the General Fund to the Revenue Fund, as required by
section 505 and 506 of the Trust Agreement on multiple occasions.

45.     On or before the 25th day of each month, the Treasurer is required to
withdraw all money in the Revenue Fund (less certain federal subsidy payments for Build
America Bonds) and deposit such funds to the credit of a special fund known as the "Sinking
Fund," which is held by the Trustee in trust for the holders of the Bonds.  *See* Ex. B (Trust
Agreement) § 507.   The Sinking Fund includes a number of separate indentured accounts,
including a fund known as the Reserve Account, which is available to fund shortfalls in the Bond
Service Account, from which the Trustee pays principal of and interest on the Bonds.   Each
month, the Bond Service Account is required to be funded with amounts as set forth in the Trust
Agreement, and the monies in the Bond Service Account are then used to pay interest on and
principal of the Bonds when due.  *See id.* §§ 507(a), 509.

46.     The Trust Agreement also established other special funds known as the
"Puerto Rico Electric Power Authority Reserve Maintenance Fund" (the "RMF"), the "Puerto
Rico Electric Power Authority Self-insurance Fund" (the "SIF"), and the "Puerto Rico Electric
Power Authority Capital Improvement Fund" (the "CIF" and together with the SIF and RMF, the
"Capital Expenditure Funds").  Monies in the Capital Expenditure Funds are generally used for
extraordinary and capital expenditures.

---

[8]     Pursuant to section 506 of the Trust Agreement, these Revenues are an amount equal to the amount of
all moneys held for the credit of the General Fund on the last day of the preceding month less such
amount to be held as a reserve for Current Expenses as the Treasurer may determine, but not more than
one-sixth (1/6) of the amount budgeted to be necessary for Current Expenses for the current fiscal year,
such transfer to be made on the books of the Authority as of the close of the preceding month.  *See* Ex. B
(Trust Agreement) § 506.

47.     Revenues are deposited in the Capital Expenditure Funds after PREPA has deposited the required amount of Revenues in the Sinking Fund pursuant to the terms of the Trust Agreement.  The Capital Expenditure Funds and the moneys therein "shall be held by the Authority in trust" and "shall be subject to a lien and charge in favor of the holders of the bonds issued and outstanding under this [Trust] Agreement and for the further security of such holders until paid out or transferred as herein provided."  Ex. B (Trust Agreement) § 507.

48.     The Capital Expenditure Funds are held by PREPA (or its designated custodian) in trust for the bondholders, and PREPA's limited ability to use such funds is expressly subject to the lien in favor of the bondholders.  *See, e.g.,* Ex. B (Trust Agreement) § 512 (providing that PREPA has a limited ability to use moneys in the RMF *"[e]xcept as hereinafter provided in this Section"*; limiting use of moneys in the SIF) (emphasis added).  Further, the Trust Agreement provides that if at any time moneys held for the credit of the Bond Service Account and the Reserve Account shall be insufficient for the purpose of paying the interest on all bonds and the principal on serial bonds as such interest and principal become due and payable, then PREPA shall transfer from the Capital Expenditure Funds to the  Bond Service Account an amount necessary to make up the deficiency.  *See id.* §§ 512, 512A, 512B.

49.     In addition, the Trust Agreement created an account known as the "Construction Fund" to fund certain costs of Improvements.[9]  The Trust Agreement provides that

---

[9]     "Improvements" are defined in the Trust Agreement as

such improvements, renewals and replacements of the System or any part thereof and such extensions and additions thereto as may be necessary or desirable, in the judgment of the Board, to keep the same in proper condition for the safe, efficient and economic operation thereof and to integrate into the System any unit or part thereof, and shall include such electric-power projects as may be authorized to be acquired or constructed by the Authority under the provisions of the [Enabling] Act and such improvements, renewals and replacements of such properties and the System and such extensions and additions thereto as may be necessary or desirable for continuous and efficient service to the public, which shall be financed in whole or in substantial part from the proceeds of

monies in the Construction Fund "shall be subject to a lien and charge in favor of the holders of the bonds issued and outstanding under this Agreement and for the further security of such holders until paid out or transferred as herein provided."  Ex. B (Trust Agreement) § 401.

50.    The Trust Agreement therefore is clear that capital expenses and costs of Improvements are not to be paid with Revenues dedicated to the payment of debt service on the Bonds and to the funding of certain bondholders' reserves as provided in the Trust Agreement. Revenues must first be applied to the Sinking Fund before any Revenues may flow to any of the Capital Expenditure Funds or to the Construction Fund.  Revenues may not be used to fund any capital expenses to the extent that debt service or requirements to fund the Reserve Account are not satisfied.  Moreover, amounts in the Capital Expenditure Funds and the Construction Fund are subject to a lien securing the Bonds.

51.    Aside from the clear prohibition against the payment of capital expenses under the waterfall provisions of the Trust Agreement, the Trust Agreement also makes clear that PREPA could not issue additional Bonds to finance capital expenses or improvements if it would adversely affect existing bondholders.  The issuance of such Bonds is restricted under the Trust Agreement to protect the security and level of credit protection provided to existing bondholders.

52.    Specifically, sections 208 and 209 of the Trust Agreement impose additional bonds tests, under which additional Bonds may not be issued unless Revenues (net of current operating expenses) exceed 120% of debt service (the "Additional Bonds Test").  Ex. B (Trust Agreement) §§ 208, 209.  PREPA is not permitted to issue additional Bonds to fund capital improvements or for other purposes permitted under the Trust Agreement unless PREPA

_____

bonds issued under the provisions of the 1947 Indenture or this Agreement or from moneys deposited to the credit of the 1947 Construction Fund, the Construction Fund or the Renewal and Replacement Fund.

Ex. B (Trust Agreement) § 101.

can satisfy the Additional Bonds Test.  The Additional Bonds Test, in turn, protects against a dilution of the debt service coverage ratio and the level of credit protection for holders of the Bonds.

### IV.      The Restructuring Support Agreement

53.      Despite having affirmative obligations in the Trust Agreement to ensure PREPA's self-sufficiency, much of PREPA's purported liquidity problems have been self-inflicted.  As one of many examples, PREPA has a long-standing practice of subsidizing and providing free power to municipalities, which in turn has drastically exacerbated PREPA's liquidity issues.  For instance, a for-profit ice skating rink in the municipality of Aguadilla effectively received free power from PREPA, even though it was operated on a *for-profit* basis and, unsurprisingly, consumed a large amount of power because it is located in a tropical climate.[10]

54.      PREPA has also historically provided public corporations with free power by failing to collect from those public corporations.  According to a report by PREPA's consultant, FTI Capital Advisors ("FTI"), dated November 15, 2014 (the "FTI Report"), PREPA had over $200 million in accounts receivable from public corporations, of which approximately 70% was over 120 days old.  A true and correct copy of the FTI Report is attached hereto as Exhibit C.  According to FTI, these past due government receivables resulted in "a de-facto subsidy to these public corporations, which has been exacerbated by the inability to take enforcement actions against non-payers."  Ex. C (FTI Report) at 17.  Despite these past due

---

[10]   *How Free Electricity Helped Dig $9 Billion Hole In Puerto Rico*, N.Y. Times, Feb 1, 2016, *available at*   https://www.nytimes.com/2016/02/02/business/dealbook/puerto-rico-power-authoritys-debt-is-rooted-in-free-electricity.html?_r=1.

receivables from other governmental agencies, FTI found that PREPA had not cut off power to a public corporation in over a decade. *See id.*

55.    FTI recommended that PREPA, at a minimum, receive "current payments for public corporation usage." Ex. C (FTI Report) at 17. Despite FTI's recommendations, the practice of subsidizing other public corporations has largely continued. For example, PREPA is listed as the largest unsecured creditor of the Puerto Rico Highways and Transportation Authority, holding a $46 million claim against that entity. *See* Case No. 17-03567, Dkt. No. 1.

56.    As a result of its mismanagement, PREPA faced potential liquidity problems in 2014. PREPA and its creditors started negotiations that culminated in a series of forbearance agreements among PREPA, the Government Development Bank (PREPA's fiscal advisor), Plaintiffs, and certain fuel line of credit lenders (such agreements, collectively, and as amended, the "Forbearance Agreement").[11] Under the Forbearance Agreement, Plaintiffs agreed to forbear from exercising certain remedies against PREPA and to amend the Trust Agreement to, among other things, temporarily suspend PREPA's requirement to fund the Bond Service Account to pay debt service and to restore the Reserve Account to the levels required under the Trust Agreement.

57.    For its part, PREPA agreed to appoint a chief restructuring officer who would work to renegotiate PREPA's debt, address PREPA's operational problems, and to enhance Revenues to ensure that PREPA could cover current operating expenses and debt service. On September 11, 2014, PREPA hired Lisa Donahue of AlixPartners as PREPA's chief restructuring officer (the "CRO") and retained AlixPartners as PREPA's outside consultant.

---

[11]    A copy of the Forbearance Agreement is available on the Government Development Bank's website, http://www.gdb-pur.com/investors_resources/prepa.html.

58.     In December 2015, PREPA and its major creditors (including Plaintiffs) entered into the RSA.  Under the RSA, Plaintiffs agreed to continue to forbear from exercising remedies and pursuant to certain amendments to the Trust Agreement continued to temporarily suspend PREPA's obligation to transfer Revenues from the General Fund to the Revenue Fund. During this time, oil prices fell and PREPA accumulated a significant amount of Revenues in its General Fund.

59.     On April 28, 2017, the Oversight Board certified a fiscal plan for PREPA (the "Fiscal Plan"), as described in more detail herein.  A true and correct copy of the Fiscal Plan is attached as Exhibit D hereto. According to the Fiscal Plan, the General Fund was projected to have a balance of $532.6 million as of June 23, 2017.  *See* Ex. D (Fiscal Plan) at 50. Even so, Plaintiffs also agreed to voluntary concessions to help restore PREPA to economic stability.

60.     The RSA terminated on June 29, 2017, after the Oversight Board declined to certify the RSA pursuant to PROMESA and after PREPA refused the creditors' offer to extend certain deadlines under the RSA.  PREPA's creditors therefore are no longer bound by the terms of the RSA, including the concessions they agreed to, or required to forbear from exercising remedies.  In addition, PREPA's obligation to remit Revenues from the General Fund to the Revenue Fund and Sinking Fund resumed immediately upon the termination of the RSA and the forbearance thereunder.

61.     Notwithstanding the termination of the RSA on June 29, 2017 and even though the General Fund was projected to have a balance of $532.6 million as of June 23, 2017, upon information and belief, since June 29, 2017, PREPA has not transferred *any* Revenues from the General Fund to the Revenue Fund, or from the Revenue Fund to the Sinking Fund as required under the Trust Agreement.  *See* Ex. D (Fiscal Plan) at 50 (providing projections for General Fund and Construction Fund balances).

62.     PREPA defaulted on the payment of debt service due on the Bonds on July 3, 2017.

**V.     The PREPA Fiscal Plan And 2018 Budget**

63.     Among other things, PROMESA (i) establishes a process for the Oversight Board to approve fiscal plans governing the future finances and budgets of the Commonwealth and its instrumentalities, including PREPA (Title II); (ii) establishes a process for the Oversight Board to file a bankruptcy petition on behalf of the Commonwealth or its instrumentalities, including PREPA (Title III); and (iii) provides for an alternative mechanism for adjusting the Commonwealth's bond debt or the bond debt of its instrumentalities outside of a bankruptcy proceeding by effectuating modifications with the substantial, but not necessarily unanimous, support of the affected bondholders (Title VI).

64.     On April 28, 2017, the Oversight Board certified the Fiscal Plan on a contingent basis, subject to certain amendments.  The Fiscal Plan was submitted and certified at the time that PREPA and AAFAF had agreed to a supplemented version of the RSA. Accordingly, the Fiscal Plan's financial projections and cash flow analysis all assume that the transactions under the RSA would be implemented.  The Fiscal Plan has not been amended since the RSA terminated.

65.     Even so, the Fiscal Plan set forth certain cash flow projections assuming that the current debt structure remains in place, and the projections contained therein assumed that *all* expenses of PREPA would be payable before debt service.  For example, in 2018, the Fiscal Plan estimates that PREPA would collect approximately $3.4 billion of Revenues.  *See* Ex. D (Fiscal Plan) at 39.  The Fiscal Plan's debt sustainability analysis then deducted expenses in the amount of $2.7 billion and an additional $709.9 million for capital expenditures.  This left only $40 million available for debt service in 2018, even though over $700 million of debt

-21-

service on the Bonds is due in fiscal year 2018.   In other words, the Fiscal Plan simply assumed that *all* of PREPA's expenses would be payable before debt service, including capital expenditures and improvements.  Notably, the aggregate amount of expenses in the Fiscal Plan includes non-operating expenses, such as "bad debt" expenses, and subsidy expenses that should be subordinate to debt service. *See id.* at 36.

66.    On or about June 30, 2017, the Oversight Board approved and certified a budget for PREPA for fiscal year 2018 (the "2018 Budget").  A certified translation of the 2018 Budget is attached as Exhibit E hereto.

67.    The 2018 Budget projects that PREPA will generate approximately $3.218 billion of income, including $3.1 billion of Revenues, $38.9 million from other income, and $24.6 million from "Loans and Bond Issues." *See* Ex. E (2018 Budget) at 1.  At the same time, the 2018 Budget projects that all of that income will be used to pay for a variety of operating and non-operating expenses. *See id.* at 3.

68.    The 2018 Budget provides for approximately $2.97 billion of expenses for "Direct Service" in fiscal year 2018.  The 2018 Budget provides for payment of approximately $2.7 billion of "Operating Expenses" that on the face of the 2018 Budget do not appear to be necessary operating expenses of PREPA. *See* Ex. E (2018 Budget) at 2.  Due to the opacity of the 2018 Budget and PREPA's failure to explain what any expenses relate to, there are approximately $2.08 billion of questionable line item expenses in the 2018 Budget, including:

| Expense | Fiscal Year 2018 |
|---|---|
| Purchased Services | $824,827,000 |
| Donations, Subsidies,  and Distributions | $284,111,000 |
| Other Operating Expenses | $131,850,000 |
| Materials and Supplies | $1,088,437,000 |
| Advertising and Press Releases | $581,000 |
| **Total** | **$2,086,806,000** |

69.     The 2018 Budget also forecasts that approximately $217.9 million of operating expenses will be incurred in fiscal year 2018 for "Support Service." *See* Ex. E (2018 Budget) at 3. As with the operating expenses for "Direct Service," the 2018 Budget does not specify what these expenses are and what they relate to.

70.     Even though PREPA bears the burden under PROMESA of proving that these expenses are current and necessary operating expenses of the System, the 2018 Budget does not explain whether such amounts are actually currently due or reasonable and necessary expenses that are needed to operate the System in an efficient or economic manner, as required under the Trust Agreement.  In addition, while the 2018 Budget provides that all $3.1 billion of Revenues will be used to cover expenses listed in the 2018 Budget, the 2018 Budget does not include any amounts for debt service on the Bonds, indicating that Revenues will not be used to cover any debt service in Fiscal Year 2018.  *See* Ex. E (2018 Budget) at 2-3.

71.     The 2018 Budget also provides for the payment of expenses that clearly do not qualify as Current Expenses under the Trust Agreement or necessary operating expenses. For example, the 2018 Budget provides for $275 million of an "Investment in Permanent Improvements" in Fiscal Year 2018.  *See* Ex. E (2018 Budget) at 4.  Costs of improvement and capital expenses are *not* operating expenses (and thus not Current Expenses), and are explicitly subordinate to the payment of debt service on the Bonds and the funding of various reserves and trust funds as described above under the Trust Agreement and PROMESA.

72.     The 2018 Budget also provides for a "Contribution to the Government of Puerto Rico." *See* Ex. E (2018 Budget) at 2.  In fiscal year 2017, the amount of that contribution was $35,858,000.  However, under the 2018 Budget, the amount of that contribution nearly doubles to $70,355,000.  The 2018 Budget contains no explanation for this expense or increase.

73.     The clear implication from the 2018 Budget and the Fiscal Plan is that virtually all of PREPA's expenses—regardless of whether such expenses qualify as necessary operating expenses of PREPA's System—are intended by PREPA to be senior to the payment of debt service on the Bonds.  The end result is that no Revenues will be available for payment of debt service on the Bonds, which, in turn, will cause further defaults during the pendency of this Title III case.

74.     This was confirmed in a filing by the Oversight Board before this Court, in which the Oversight Board, on its own volition, invoked section 928(b) of the Bankruptcy Code. *See* Dkt No. 149 at 18-19; Dkt. No. 149-1 ¶ 10.  As discussed herein, section 928(b) only applies to postpetition special revenues subject to a lien resulting from a prepetition security agreement (*i.e.*, the Trust Agreement).  Further, as discussed in more detail herein, the general purpose of section 928(b) is to permit the continued operation of the system that generates the pledged revenues, but was not intended to override the definition of "current operating expenses" included in the municipal finance documents.

75.     Specifically, the Oversight Board claims that PREPA projects revenues of approximately $3.32 billion, and projects to pay in fiscal year 2018 approximately $3.25 billion to $3.5 billion on account of what it claims to be Current Expenses.  *See* Dkt No. 149 at 18-19; Dkt. No. 149-1 ¶ 10.  Based on the Fiscal Plan (which lists approximately $2.67 billion of purported operating expenses in fiscal year 2018), the expenses that the Oversight Board claims are "Current Expenses" clearly include capital expenditures that are not payable pursuant to section 505 of the Trust Agreement.

76.     Based on the purported $3.5 billion of expenses that the Oversight Board claims are "Current Expenses," the Oversight Board stated that "PREPA does not expect to have any excess revenues after paying the PREPA Current Expenses" or above the amounts on reserve

for budgeted Current Expenses.  *See* Dkt. No. 149-1 ¶ 11.  This ignores that the rate increase was specifically approved by the Energy Commission to cover debt service on the Bonds.  In January 2017, for example, the Energy Commission issued a final resolution and order (the "Rate Order") that established a rate that was intended to cover debt service on the Bonds, PREPA's operating expenses, and certain capital expenses.  A true and correct copy of the Rate Order is attached as Exhibit F hereto.  Thus, contrary to the Oversight Board's assertions, surplus Revenues are required to flow to the Sinking Fund.  *See* Ex. F (Rate Order) at 4-5 (noting that rates were established at levels that would produce at least $593 million of Revenues, even after payment of operating expenses).

77.    Even assuming arguendo that Revenues are used to cover all purported "operating expenses" provided for in the Fiscal Plan, based on PREPA's projected gross Revenues in the Fiscal Plan, approximately $754 million of Revenues would remain after payment of such purported operating expenses in fiscal year 2018.  *See* Ex. D (Fiscal Plan) at 39 (providing for surplus of $754 million after payment of purported operating expenses in fiscal year 2018).  Thus, based on PREPA's own figures in its Fiscal Plan—which the Oversight Board certified—Revenues are required to be remitted to the Trustee to cover debt service on the Bonds.

## VI.    The Commencement Of PREPA's Title III Case

78.    On July 2, 2017, the Oversight Board commenced a case on behalf of PREPA under Title III of PROMESA.

79.    That same day, the Oversight Board filed a statement regarding PREPA's Title III case.  In that statement, the Oversight Board conceded that the Bonds "have the same priority, lien and collateral structure, ***secured by a lien on all of PREPA's revenues.***"  Dkt. No. 2 at 3 (emphasis added).

80. As a result of the commencement of PREPA's Title III case, the Oversight Board consented to the application of all provisions within Title III, including all provisions of the Bankruptcy Code made applicable to this case by virtue of section 301(a). The special revenue protections of the Bankruptcy Code now apply to the Revenues, and Defendants are required to remit such collateral to the Trustee for payment of debt service on the Bonds and the funding of reserves as provided in the Trust Agreement.

81. On July 19, 2017, Plaintiffs sent a letter ("July 19 Letter") to Defendants requesting that the Defendants provide them with the Defendants' plans to comply with section 922(d) of the Bankruptcy Code, as discussed herein. A copy of the July 19 Letter is attached as Exhibit G hereto. In the July 19 Letter, Plaintiffs also requested that the Defendants respond to their request no later than July 26, 2017, and to begin to provide them with basic information, such as whether PREPA transferred Revenues from the General Fund to the Revenue Fund on or before July 15, 2017. *See* Ex. G (July 19 Letter) at 3.

82. On July 30, 2017, counsel for AAFAF, on behalf of PREPA, sent a "response" to the July 19 Letter, which is attached as Exhibit H hereto (the "July 30 Letter"). In its letter, AAFAF did not respond at all to the July 19 Letter in substance, and merely stated that PREPA disagreed with "many of the legal and factual statements contained therein." Ex. H (July 30 Letter) at 2. AAFAF also did not provide any of the basic information—that should be easily accessible—that Plaintiffs had requested in the July 19 Letter, including whether PREPA transferred Revenues to the Revenue Fund on or before July 15, 2017. *See id.* Without agreeing to provide any of the information requested in the July 19 Letter, AAFAF merely promised that AAFAF and PREPA would confer with advisors to the Oversight Board to "determine what information they have available that can be provided in response to [Plaintiffs'] requests[.]" *Id.*

Defendants PREPA and AAFAF have not followed up on the July 30 Letter, and the Oversight

Board has not responded at all to the July 19 Letter.

83.     In a filing before this Court on July 31, 2017, the Oversight Board claimed

that PREPA does not have sufficient Revenues after paying what it claims are Current Expenses.

*See* Dkt. No. 149 at 18-19.  In doing so, the Oversight Board contended that section 928(b) of the

Bankruptcy Code could " add additional expenses that might be deducted" from Revenues prior

to the payment of debt service on the Bonds.  *See id.* at 18 n.8.  By failing to meaningfully

respond to the July 19 Letter, and by taking the extreme position in PREPA's Title III case that

no Revenues will be available for debt service on the Bonds, Defendants have therefore forced

Plaintiffs to commence this action to enforce their rights under PROMESA, the Bankruptcy

Code, the U.S. Constitution, and other applicable laws and statutes.

**VII.    The Special Revenue Provisions Of The Bankruptcy Code**

84.     Section 902(2) of the Bankruptcy Code defines "special revenues" in

relevant part as:

> (A) receipts derived from the ownership, operation, or disposition
> of projects or system of the debtor that are primarily used or
> intended to be used primarily to provide transportation, utility, or
> other services, including the proceeds of borrowings to finance the
> projects or systems; [or]
>
> *             *             *
>
> (D) other revenues or receipts derived from particular functions of
> the debtor, whether or not the debtor has other functions[.]

11 U.S.C. § 902(2).

85.     Section 902(2) of the Bankruptcy Code is phrased in the disjunctive,

meaning that only one category specified in section 902(2) needs to be satisfied for taxes or

revenues to qualify as "special revenues."

86.     The Bonds are special revenue bonds, secured by, among other things, a valid and enforceable lien on the Revenues.  Specifically, the Revenues are clearly "receipts derived from the ownership, operation, or disposition of projects or system of the debtor that are primarily used or intended to be used to provide . . . utility, or other services[.]"  11 U.S.C. § 902(2)(A).   The Revenues are also "other revenues or receipts derived from particular functions of the debtor, whether or not the debtor has other functions[.]"  *Id.* § 902(2)(D).

87.     Section 928(a) of the Bankruptcy Code, made applicable to these proceedings by Section 301 of PROMESA, provides in relevant part that "special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case."  11 U.S.C. § 928(a); 48 U.S.C. § 2161.

88.     Section 928(a) of the Bankruptcy Code, along with sections 902 and 922(d) of the Bankruptcy Code, was enacted in 1988 as part of a series of amendments to chapter 9 (as amended, the "Special Revenue Provisions").   The Special Revenue Provisions were enacted to correct prior amendments made to chapter 9 in the 1970s, under which Congress liberalized that chapter to give large municipalities access to bankruptcy relief.  As a result of those amendments, "Chapter 9 generally was amended to apply commercial bankruptcy law concepts to municipal corporations."  S. Rep. No. 100-506, at 3.  However, given that municipal financings differ significantly from corporate financings, "some of the specific effects of the sweeping application of commercial law concepts to municipal corporations have raised serious concerns" and those effects ran "afoul of the traditional structure of revenue bond finance."  *Id.* at 4.  Indeed, Congress recognized that the application of these commercial finance principles "simply did not work" in the municipal bankruptcy arena.  *See id.* at 3.

89.     The stated purpose of the Special Revenue Provisions was to correct the potential problems relating to revenue bond financings created by the incorporation of general commercial finance concepts into chapter 9 and to "insure that revenue bondholders receive the benefit of their bargain with the municipal issuer, **_namely they will have unimpaired rights to the project revenue <u>pledged</u> to them._**" S. Rep. No. 100-506, at 12 (emphasis added).  Indeed, the intent of section 928(a) of the Bankruptcy Code is "to negate [s]ection 552(a) in the municipal context" and provide distinctive protections to creditors holding consensual prepetition liens on "special revenues." *See id.* at 12-13.[12]

90.     Among other things, Congress was concerned about the potential conversion of limited recourse revenue bonds into unsecured obligations with postpetition pledged revenues becoming available to general creditors or other stakeholders of the sponsoring state, territory or municipality.  A public corporation, such as PREPA, is an "enterprise with separate funds . . . [with] funds derived from one source [that] are often legally unavailable for other enterprises or for general governmental purposes." S. Rep. No. 100-506, at 8.  Seeking to maintain the separateness of such entities in enacting the Special Revenue Provisions, Congress stated that if "a municipality is unable to meet its obligations for general governmental purposes, and for that reason files a bankruptcy petition, the assets of its water department should not be reached to pay general creditors of the municipality unless they could be reached under applicable nonbankruptcy law." *Id.* at 8-9.  Absent the Special Revenue Provisions, the impact of sections 362 and 552 of the Bankruptcy Code would effectively relegate revenue bondholders to an unsecured status by frustrating the pledge of revenues, which is a result that would run afoul of applicable nonbankruptcy law. *See id.* at 5-6.

---

[12]     Although section 928(a) renders section 552(a) irrelevant to the Revenues, Plaintiffs  reserve the right to argue that  section 552(a) does not apply to the Revenues in the first instance.

91.     The Trust Agreement is replete with language pledging and granting to the Trustee and bondholders a lien or charge on the present and future Revenues of the System to secure payment of the Bonds issued from time to time under the Trust Agreement, subject to the terms of the Trust Agreement. It is found in the granting clause. *See* Ex. B (Trust Agreement) at 11-12 (pledging "revenues of the System . . . as security for the payment of the bonds and the interest and redemption premium, if any, thereon"). It is confirmed by PREPA's commitment to hold all Revenues in indentured funds in trust at qualified Depositories for the benefit of the Trustee and bondholders and to use and transfer the same only as permitted under the Trust Agreement. *Id* § 601. It is found in PREPA's binding commitment not to permit "any charge or lien or charge on the Revenues ranking equally with or prior to the **charge or lien on the Revenues of the bonds issued under and secured by this Agreement**." *Id* § 712 (emphasis added); *see also id.* § 1102. It is correspondingly confirmed by the exclusive and limited recourse of bondholders to payments from the Revenues "pledged to the payment thereof." *See id.* § 701. It is found in the Rate Covenant and special statutory remedies created by Puerto Rico to assure that electricity rates would be sufficient to pay the Bonds. Finally, it is found in the Uniform Commercial Code financing statements, which cover all of the Revenues, as well as in numerous legal opinions rendered by PREPA's advisors confirming the creation and validity of the pledge.

92.     Therefore, section 928(a) of the Bankruptcy Code applies because (i) the Revenues are "special revenues" under sections 902(2)(A) and (D) of the Bankruptcy Code, and (ii) the Revenues are subject to a lien that is created by the Trust Agreement. As a result of section 928(a), the lien on the Revenues continues to attach to Revenues that PREPA held on the petition date and that it collects during its Title III case.

93.     Section 922(d) of the Bankruptcy Code, made applicable to these
proceedings by section 301 of PROMESA, provides in relevant part that the filing of a
bankruptcy petition under chapter 9 "does not operate as a stay of application of **pledged** special
revenues in a manner consistent with section [928][13] of the Bankruptcy Code] to payment of
indebtedness secured by such revenues."  11 U.S.C. § 922(d) (emphasis added).

94.     Section 922(d) of the Bankruptcy Code applies to all pledged special
revenues, including revenues that are not currently in the possession of the secured party.  S.
Rep. No. 100-506, at 13.  In enacting section 922(d), Congress intended to provide revenue
bondholders with "[r]easonable assurance of timely payment" and to prevent any potential
interference with the effectuation of a pledge by virtue of the automatic stay.  *Id.* at 21.
However, the Bankruptcy Code, including the automatic stay, frustrated the effectuation of the
pledge and prevented "any post-petition collection activities against the debtor."  *Id.* at 11.  Such
interference, as Congress recognized, would needlessly disrupt the municipal bond market.  *See*
*id.* at 21.  Indeed, the legislative history supports the conclusion that Congress intended to spare
holders of revenue bonds from the delay and expense associated with enforcing their rights to
timely payment to accomplish what the Special Revenue Provisions contemplate—"the
application of pledged revenues after payment of operating expenses to the payment of secured
bonds."  *Id.* at 11.  Consequently, section 922(d) is not merely a provision that authorizes a
debtor to remit pledged revenues if it so chooses; instead, the legislative history makes
abundantly clear that the debtor is required to remit pledged revenues to ensure timely payment
of revenue bonds.

---

[13]    The reference to section 927 in section 922(d) is a scrivener's error.  The intended reference is to
section 928 of the Bankruptcy Code.

95.     Thus, Congress created a statutory scheme that is designed to recognize and respect differences between municipal financings, which are secured by a pledge of revenues, rate covenant and statutory receiver remedy, and corporate financings, which are frequently secured by a mortgage or other lien on physical assets, by providing that the collateral package securing revenue bondholders is not cut off in a bankruptcy proceeding.  This statutory design can only be effected by recognizing the right of municipal creditors secured by a pledge of special revenues to have the benefit of that pledge apply to postpetition revenues. Consequently, pursuant to section 922(d) of the Bankruptcy Code, a debtor is required to remit all pledged special revenues to the bond trustee during the pendency of any Title III case and the automatic stay does not preclude efforts to compel the debtor to apply such revenues in accordance with the governing bond documents.

96.     In addition, section 928(b) provides limitations on the ability of a municipal debtor to use pledged special revenues during a Title III case.  Specifically, section 928(b) provides that certain liens on "special revenues . . . derived from a project or system shall be subject to the ***necessary operating expenses*** of such project or system[.]"  11 U.S.C. § 928(b) (emphasis added).

97.     Section 928(b) applies only to a limited universe of expenses, and makes liens on special revenues derived from a project or system subject only to the necessary operating expenses of such project or system.  11 U.S.C. § 928(b).  Such operating expenses include only "those necessary to keep the project or system going . . . ***so that the project or system can be maintained in good condition to generate the revenue to repay bondholders***[***.***]" H.R. Rep. No. 100-1011, at 8 (1988) (emphasis added).  Necessary operating expenses ***do not include*** expenses that do not qualify as operating expenses, such as capital improvements or enhancements.  *See In re Jefferson Cty., Ala.*, 482 B.R. 404, 437 (Bankr. N.D. Ala. 2012)

(emphasis added).  Further, section 928(b) does not include expenses that may be needed in the future, but are not currently payable.

98.     Contrary to the Oversight Board's erroneous contention that section 928(b) "could add additional expenses that might be deducted," (*see* Dkt. No. 149 at 18 n.18), Congress did not intend for section 928(b) to change the priority and intent of the use of the special revenues under the terms of the municipal debt financing documents.  *See* S. Rep. No. 100-506, at 23  This is because the purpose of the Special Revenue Provisions is to ensure that revenue bondholders receive the benefit of their bargain and the unimpaired right to their pledged revenues.  Consequently, section 928(b) is merely intended to cover those expenses of the project that are "necessary to keep the project or system going ***and producing special revenues.***"  *Id.* at 22 (emphasis added).   Thus, the "operating expenses are to be necessary and directly related to the project or system generating the special revenues and are not the expenses of the municipality generally or for other systems or projects."  *Id.* at 23.

99.     PREPA's own agents have admitted that the protections of the Special Revenue Provisions would apply in a PREPA Title III case.   For example, Lisa Donahue, PREPA's former CRO, testified at a hearing before the Energy Commission in December 2016 that PREPA bondholders would be entitled in a Title III case to receive a full recovery because the bonds are secured by special revenues. Specifically, Ms. Donahue stated:

> To set up a municipal utility to default in the hope that you can artificially create some sort of incremental power with creditors is a dangerous thing.  ***These are special revenue bonds***; the deal we have negotiated is fair and balanced and gives PREPA the requirements of the breathing room to invest in the system.  I would be concerned with the effect of that strategy.

*Donahue Says PREPA Won't Use PROMESA to Get Better Deal from Bondholders,* Caribbean

Business, Dec. 1, 2016, *available at* http://caribbeanbusiness.com/prepa-has-more-than-600m-in-

debt-payments-due-next-year-while-rsa-expires-dec-15/ (emphasis added).

100.    Impairment of the Bonds caused by the diversion of pledged Revenues to

pay all of PREPA's expenses would have devastating effects on the entire municipal revenue

bond market, and would certainly impede PREPA's access to the capital markets going forward.

Revenue bonds issued by a public utility, such as the Bonds, are issued with the understanding

that they are supported by a valuable collateral package (including a lien on pledged special

revenues, an enforceable rate covenant and a binding commitment to ensure reasonable

collection of bills), "even in the event of insolvency."  S. Rep. No. 100-506, at 25.  As the

Department of Justice recognized:  "A municipality's ability to enter financial markets and its

cost of borrowing funds are dependent on such assurances."  *Id.*

101.    Allowing a debtor to surcharge the lien on special  revenues for expenses

that do not constitute current "operating expenses" as defined under a bond indenture would

violate the terms of a revenue pledge and would therefore contravene the stated intent of the

Special Revenue Provisions and the stated purpose of PROMESA:  that bondholders receive the

benefit of their bargain and the unimpaired right to their pledged special revenues during a

bankruptcy case.  In fact, the legislative history provides that the "intent of [section 928(b)] is not

to change the priority and intent of the use of the special revenues under the terms of the

municipal debt financing documents."  S. Rep. No. 100-506, at 23.

102.    Further, maintaining below market rates and charges of a public utility in

order to drive economic growth within the sponsoring state, territory or municipality is

essentially a taking of collateral (*i.e.*, pledged revenues that are required to be generated under

the collateral package securing the revenue bonds of such public utility) and distribution of such

collateral for the benefit of other stakeholders of such sponsoring state, territory or municipality

would violate the fundamental premise of the Special Revenue Provisions: general creditors and

other stakeholders of a sponsoring state, territory or municipality should not be able to reach the

assets of a public corporation or enterprise that are pledged to secure its revenue bonds, even if

that state, territory or municipality is in bankruptcy.  S. Rep. No. 100-506, at 8-9.

103.    Without the protections of the Special Revenue Provisions, credit will dry

up for PREPA and other municipalities and public utilities, which will be devastating to other

municipal issuers throughout the United States and its territories who have borrowing needs for

constructing, maintaining and operating projects or systems.  Indeed, Congress noted that in the

absence of the Special Revenue Provisions:

> municipalities . . . may have trouble raising money through special
> revenue bonds, disrupting the municipal finance market and
> harming the municipalities.  Lenders may be reluctant to advance
> funds for projects, particularly in municipalities that are having
> some financial difficulties, when the possibility exists that the lien
> securing repayment could be avoided if the municipality files for
> bankruptcy.  Proponents argue that bond rating agencies may
> downgrade the creditworthiness of certain special revenue bonds
> because of what could happen in a bankruptcy.

H.R. Rep. No. 100-1011, at 5.

## VIII.   The Special Revenue Provisions Preempt The Fiscal Plan And 2018 Budget

104.    The Fiscal Plan and 2018 Budget cannot interfere with Defendants'

obligations to remit the Revenues for payment of the Bonds, because the Special Revenue

Provisions preempt the Fiscal Plan and 2018 Budget.

105.    Specifically, the Special Revenue Provisions provide that (i) pledged

special revenues remain subject to a lien, (ii) the application of pledged special revenues is not

subject to the automatic stay, and (iii) the lien on pledged special revenues (to the extent derived from a project or system) is subject only to payment of necessary operating expenses of the project or system that generates such revenues.  Thus, the Special Revenue Provisions set forth clear and distinct protections for revenue bondholders (such as Plaintiffs) and restrict the ability of a municipal debtor to use pledged special revenues for anything other than necessary operating expenses and debt service.

106.    Having filed a Title III petition on behalf of PREPA, Defendants have no right to cherry pick which provisions of the Bankruptcy Code apply in PREPA's Title III case. Further, the Oversight Board has voluntarily invoked section 928(b) in PREPA's Title III case. *See* Dkt. No. 149 at 18 n.8.

107.    The 2018 Budget and Fiscal Plan violate the Special Revenue Provisions of the Bankruptcy Code, as incorporated into PROMESA, because they require subordination of payment of debt service on the Bonds and funding of reserves as provided in the Trust Agreement to the payment of *all* of PREPA's expenses.  On its face, section 928(b) of the Bankruptcy Code only authorizes the debtor to use pledged special revenues to cover *necessary operating* expenses of the system or project that generates the pledged special revenues, not *all* expenses of the debtor.

108.    The Fiscal Plan requires that Revenues will first be used to cover capital expenditures and other non-operating expenses.  For example, the Fiscal Plan unambiguously provides that in fiscal year 2018, $709.9 million of "capital expenditures" would be paid before any cash flow is available to cover debt service.  *See* Ex. D (Fiscal Plan) at 39.  However, a capital expenditure is not a necessary operating expense.  For example, the Fiscal Plan outlines a $4.66 billion capital investment program, which includes approximately $470 million of capital

expenditures to be incurred in connection with the Aguirre Offshore Gasport, a construction project that the Energy Commission has not approved. *Id.* at 52.

109. Another capital improvement that is contemplated under the Fiscal Plan is a new generation unit at Palo Seco. Ex. D (Fiscal Plan) at 53. The Fiscal Plan also includes $1.682 billion of a P3 generation investment initiative to "create competitive bidding opportunities for private developers." *Id.* at 52. The capital investment program also includes $2.5 billion of capital outlays for transmission and distribution investment that are "intended to transform Puerto Rico's system into a modern grid capable of handling variable load and generating from renewables and distributed generation energy while maintaining high level safety and reliability." *Id.* The investments contemplated under the Fiscal Plan are not necessary operating expenses. Rather, as the Fiscal Plan suggests, these expenses are capital expenses that relate to improvements to PREPA's system.

110. Similarly, the 2018 Budget includes approximately $249 million of permanent improvement expenses related to "Direct Service" and an additional $26.3 million of permanent improvement expenses for "Support Service." *See* Ex. E (2018 Budget) at 2-3. Given that such expenses unambiguously are characterized as *investments* in permanent improvements, such expenses do not qualify as necessary operating expenses and therefore PREPA is not entitled to use Revenues to pay such expenses under section 928(b) of the Bankruptcy Code.

111. Likewise, the Fiscal Plan lists over $2.67 billion of aggregate expenses that are purportedly payable before debt service on the Bonds. Ex. D (Fiscal Plan) at 39; *see also id* at 36. However, that figure includes "bad debt" expenses and other expenses that are not reasonable and necessary to maintain or operate the System. *See id.* The 2018 Budget similarly includes these expenses, even though the 2018 Budget leaves no Revenues available for debt

service on the Bonds.  None of these expenses qualify as operating expenses, let alone necessary operating expenses of the System.  Payment of such expenses before debt service is therefore not permitted under section 928(b).

112.    Moreover, even aside from the fact that none of the expenses mentioned above are covered by section 928(b), many of the expenses included in the 2018 Budget and Fiscal Plan are subordinate to the payment of debt service on the Bonds and the funding of certain reserves under the Trust Agreement.  Under the Trust Agreement, capital expenditures and costs of improvements are payable from the Capital Improvement Fund.  PREPA is not entitled to pay capital expenditures until after it has paid debt service in full.  *See, e.g.*, Ex. B (Trust Agreement) § 507 (providing for restoration of all bondholder reserves in full before payment into the Capital Improvement Fund).  Moreover, none of these expenses qualify as Current Expenses that are "reasonable and necessary for maintaining, repairing and operating the System in an efficient and economical manner."  *Id.* § 505.  Rather, these expenses relate to improvements to the System.  Such costs of improvement are subordinate to debt service.

113.    Regardless of the contents of the Fiscal Plan or the 2018 Budget, Defendants are not permitted to override the PREPA bondholders' lien.  Congress retained the Special Revenue Provisions of the Bankruptcy Code in PROMESA, and these special revenue provisions preempt any contrary provisions of the Fiscal Plan and the 2018 Budget.  *See* 48 U.S.C. § 2161 (incorporating sections 922 and 928 of the Bankruptcy Code). The Oversight Board commenced PREPA's Title III case with full knowledge that these provisions would apply, and that such Special Revenue Provisions restrict PREPA's ability to use pledged special revenues.  Accordingly, the lien securing the Bonds remains enforceable against revenues received after the filing of PREPA's Title III petition by the Oversight Board.

### IX.     Withholding Revenues To Pay For All Expenses Violates The Takings Clause Of The U.S. Constitution

114.     The Takings Clause of the Fifth Amendment to the U.S. Constitution (the "Takings Clause") provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V.  The Takings Clause applies to the States and the Commonwealth by virtue of section 1 of the Fourteenth Amendment to the U.S. Constitution (the "Due Process Clause"), which provides, "No State . . . shall . . . deprive any person of life, liberty, or property, without due process of law." *Id.* amend XIV, § 1.  The Fourteenth Amendment extends to Puerto Rico. *See Posadas de P.R. Assocs. v. Tourism Co. of P.R.*, 478 U.S. 328, 331 n.1 (1986).

115.     PREPA's bondholders hold a lien on the Revenues, and PREPA specifically pledged those Revenues to secure the Bonds.  Those Revenues, in turn, are required to be maintained at levels sufficient to cover both Current Expenses and 120 percent of the principal and interest requirements on the Bonds in a given year.  Further, PREPA made a binding commitment to maintain reasonable regulations to collect bills, thereby ensuring that Revenues are sufficient to cover debt service and Current Expenses.  Each of these binding commitments in respect of the pledged Revenues under the Trust Agreement must be viewed as part of the collateral package securing the payment of the Bonds.  A lien is a property interest that is protected by the Takings and Due Process Clauses. As holders of and express third party beneficiaries of the lien on the Revenues, Plaintiffs have a lawful property right and interest in the Revenues and the rights relating thereto, which are protected by the Takings and Due Process Clauses

116.     Plaintiffs also have a right under the Trust Agreement to receive Revenues, subject only to payment of Current Expenses that are reasonable and necessary to

operate the System in an economic and efficient manner.   Plaintiffs also have a contractual and statutory right to the appointment of a receiver in the event that PREPA fails to maintain rates at a level sufficient to pay the Bonds.  A contractual right and statutory entitlement each constitutes a form of property for purposes of the Takings and Due Process Clauses.

117.    Capital expenses, costs of improvement, and expenses that are not reasonable and necessary to operate PREPA in an efficient manner are unambiguously subordinate to the payment of debt service on the Bonds and funding of certain bondholder reserves under the Trust Agreement.  Costs of improvement and capital expenses are payable from the Capital Improvement Fund, which does not receive Revenues unless and until PREPA has replenished all accounts in the Sinking Fund, as required under section 507 of the Trust Agreement.  *See* Ex. B (Trust Agreement) § 507.  Payment of such capital expenses prior to payment of debt service on the Bonds is an unlawful taking of Revenues, which violates the Takings and Due Process Clauses.

118.    Defendants have not offered or provided just compensation to Plaintiffs for the unlawful use and withholding of Revenues to pay for non-current and non-necessary operating expenses.  Thus, the withholding or use of such Revenues to pay for such unlawful expenses is an unlawful taking of Plaintiffs' property in violation of the Takings and Due Process Clauses.

## FIRST CLAIM FOR RELIEF
### (For Declaratory Relief Pursuant to 28 U.S.C. §§ 2201 and 2202 for Violations of Sections 922(d) and 928(a) of the Bankruptcy Code against All Defendants)

119.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 118 hereof, as if fully set forth herein.

120.    The Bonds are secured by (i) receipts derived from the operation and ownership of a project or system that provides utility or other services to the citizens of Puerto

Rico; and (ii) receipts or revenues derived from particular functions of the debtor.  11 U.S.C.
§ 902(2)(A), (D).

121.    Postpetition Revenues securing the Bonds remain subject to liens resulting
from security agreements entered into by PREPA, including the lien granted under the Trust
Agreement.

122.    Plaintiffs are entitled to an order declaring that the filing of PREPA's Title
III petition by the Oversight Board does not operate as a stay of the application of Revenues to
the payment of debt service on the Bonds, including Revenues that are not currently in the
possession of the Trustee.

123.    Plaintiffs are further entitled to an order declaring that the failure to remit
Revenues securing the Bonds for application to debt service during PREPA's Title III case
violates sections 922(d) and 928(a) of the Bankruptcy Code as made applicable to PREPA's Title
III case by section 301 of PROMESA.

124.    An actual and justiciable controversy has arisen and exists between the
parties with respect to these issues and claims and a declaratory judgment is necessary to resolve
such controversy.

<b><u>SECOND CLAIM FOR RELIEF</u></b>
<b>(Declaratory Relief Pursuant to 28 U.S.C. §§ 2201 and 2202 for Violations of Sections
922(d) and 928(b) of the Bankruptcy Code against all Defendants)</b>

125.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1
through 124 hereof, as if fully set forth herein.

126.    Section 928(b) of the Bankruptcy Code provides that a lien on pledged
special revenues derived from a project or a system is subject only to the necessary operating
expenses of such project or system.

127.    Amounts that PREPA and other Defendants are holding or reserving in the
General Fund or any other accounts that are chargeable to capital expenses or improvements do
not qualify as necessary operating expenses and therefore are subordinate to the payment of debt
service on the Bonds and the funding of certain reserves under the Trust Agreement.

128.    Defendants are not authorized to withhold Revenues to pay for future
expenses because section 928(b) only authorizes payment of current and necessary operating
expenses.

129.    Expenses related to PREPA's capital investment program, including new
construction projects at Palo Seco and the Aguirre Offshore Gasport, public-private partnership
generation, and the transmission and distribution maintenance and investment program are not
operating expenses, but, rather, provide for improvements to PREPA's system.

130.    The $275 million of investments in permanent improvements included in
the 2018 Budget are capital expenses and expenses related to improvements to the System.

131.    Capital expenses and improvements are not payable prior to debt service
on the Bonds either under section 928(b)  or under the Trust Agreement.

132.    Expenses that are not current and not reasonable and necessary for
maintaining, repairing, or operating the System in an efficient manner are subordinate to
payment of debt service on the Bonds under the Trust Agreement and do not constitute
"necessary operating expenses" under section 928(b).   Payment of such expenses prior to
payment of debt service on the Bonds is also unlawful under the Trust Agreement and section
928(b).

133.    Plaintiffs are entitled to an order declaring that capital improvements,
capital expenditures, and all other expenses that are not current and not reasonable and necessary
for maintaining, repairing, or operating the System in an efficient manner are subordinate to

payment of debt service on the Bonds and the funding of certain reserves as provided under the

Trust Agreement and therefore may not be charged against Revenues prior to the payment of

such  debt service and the funding of such reserves.

134.    An actual and justiciable controversy has arisen and exists between the

parties with respect to these issues and claims and a declaratory judgment is necessary to resolve

such controversy.

### THIRD CLAIM FOR RELIEF
**(Declaratory Relief Pursuant to 28 U.S.C. §§ 2201 and 2202 for Violations
of the Takings Clause against All Defendants)**

135.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1

through 134 hereof, as if fully set forth herein.

136.    Pursuant to the 2018 Budget and Fiscal Plan, Defendants have taken and

will continue to take Plaintiffs' property and the property of PREPA's bondholders without just

compensation.

137.    Plaintiffs are entitled to an order declaring that Defendants' withholding or

use of Revenues for capital expenditures, future expenses, and all other non-current expenses

that are not reasonable and necessary to operate or maintain the System in an efficient and

economical manner is an unlawful taking of Plaintiffs' property without just compensation under

the Takings Clause.

138.    An actual and justiciable controversy has arisen and exists between the

parties with respect to these issues and claims and a declaratory judgment is necessary to resolve

such controversy.

## FOURTH CLAIM FOR RELIEF
### (Declaratory Relief Pursuant to 28 U.S.C. §§ 2201 and 2202 for Violations
### of the Due Process Clause against All Defendants)

139.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1
through 138 hereof, as if fully set forth herein.

140.    Pursuant to the 2018 Budget and Fiscal Plan, Defendants have taken and
will continue to take Plaintiffs' property and the property of PREPA's bondholders without due
process of law.

141.    Plaintiffs are entitled to an order declaring that Defendants' withholding or
use of Revenues for capital expenditures, future expenses, and all other non-current expenses
that are not reasonable and necessary to operate or maintain the System in an efficient and
economical manner is an unlawful deprivation of Plaintiffs' property interests without due
process of law under the Due Process Clause.

142.    An actual and justiciable controversy has arisen and exists between the
parties with respect to these issues and claims and a declaratory judgment is necessary to resolve
such controversy.

## FIFTH CLAIM FOR RELIEF
### (Injunctive Relief for Violations of Sections 922(d) and 928(a)
### of the Bankruptcy Code against All Defendants)

143.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1
through 142 hereof, as if fully set forth herein.

144.    Plaintiffs are entitled to an injunction prohibiting Defendants from taking
or causing to be taken any action that would further violate sections 922(d) and 928(a) of the
Bankruptcy Code as made applicable to PREPA's Title III case by section 301 of PROMESA.

145.    Unless Defendants are enjoined from taking or causing to be taken any
action that would further violate sections 922(d) and 928(a) of the Bankruptcy Code, Plaintiffs

will be irreparably harmed given that Defendants seek to charge all expenses against Revenues for an indefinite period of time, which will cause further payment defaults.  There is no adequate remedy at law.

146.    The balance of hardships is in favor of Plaintiffs due to the irreparable harm Plaintiffs will suffer if Defendants are not enjoined from taking or causing to be taken any action that would further violate sections 922(d) and 928(a) of the Bankruptcy Code.  Defendants will not be unduly harmed if they are so enjoined.  Injunctive relief is in the public interest.

### SIXTH CLAIM FOR RELIEF
**(Injunctive Relief for Violations of Sections 922(d) and 928(a)
of the Bankruptcy Code against All Defendants)**

147.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 146 hereof, as if fully set forth herein.

148.    Plaintiffs are entitled to an order requiring Defendants to promptly and regularly remit Revenues securing the Bonds in accordance with sections 922(d) and 928(a) of the Bankruptcy Code as made applicable to these Title III proceedings by Section 301 of PROMESA.

149.    Unless Defendants are ordered to promptly and regularly remit Revenues securing the Bonds in accordance with Sections 922(d) and 928(a) of the Bankruptcy Code, Plaintiffs will be irreparably harmed.  There is no adequate remedy at law.

150.    The balance of hardships is in favor of Plaintiffs due to the irreparable harm Plaintiffs will suffer if Defendants are not ordered to promptly and regularly remit Revenues securing the Bonds in accordance with Sections 922(d) and 928(a) of the Bankruptcy Code.  Defendants will not be unduly harmed if they are so enjoined. Injunctive relief is in the public interest.

## SEVENTH CLAIM FOR RELIEF
### (Injunctive Relief for Violations of the U.S. Constitution against All Defendants)

151.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 150 hereof, as if fully set forth herein.

152.    Defendants' withholding or use of Revenues for capital expenses and all other expenses that are not reasonable and necessary to operate or maintain the System in an efficient and economical manner is unconstitutional and violates the Takings and Due Process Clauses.

153.    Plaintiffs are entitled to an injunction prohibiting Defendants from using Revenues to fund capital expenses and all other expenses that are not reasonable and necessary to operate or maintain the System in an efficient and economical manner before PREPA complies with its obligations under section 507 of the Trust Agreement.

154.    Unless Defendants are ordered to remit Revenues to pay debt service on the Bonds and to fund certain reserves as provided for in the Trust Agreement prior to payment of expenses that do not constitute "necessary operating expenses" under section 928(b), Plaintiffs will be irreparably harmed given that Defendants seek to charge all expenses against Revenues for an indefinite period of time, which will cause further payment defaults.  There is no adequate remedy at law.

155.    The balance of hardships is in favor of Plaintiffs due to the irreparable harm Plaintiffs will suffer if Defendants are not ordered to remit Revenues securing the Bonds in accordance with the Trust Agreement.  Defendants will not be unduly harmed if they are so enjoined.  Injunctive relief is in the public interest.

### EIGHTH CLAIM FOR RELIEF
**(Accounting)**

156.    Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 155 hereof, as if fully set forth herein.

157.    PREPA is required under the Trust Agreement to set forth the amount of Current Expenses and the Revenues in the General Fund that are used to cover such Current Expenses shall not exceed the amounts that are reasonable and necessary for operating and maintaining the System.

158.    Plaintiffs seek an accounting from Defendants as to in each month during the Title III case, (i) the amount of Current Expenses, (ii) the amount of Revenues net of Current Expenses, (iii) the basis for why each expense is reasonable and necessary to operate and maintain the System, and (iv) the balances of accounts created under the Trust Agreement.

159.    Plaintiffs are entitled to an order requiring Defendants to submit each month to Plaintiffs and the Trustee reports that itemize each and every current operating expense that Defendants seek to prioritize over the Bonds, and the balances of each account created under the Trust Agreement.

### RELIEF DEMANDED

WHEREFORE Plaintiffs respectfully request that the Court enter judgment against Defendants as follows:

(a)    Declaring that the application of Revenues to the payment of debt service on the Bonds, including Revenues that are not currently in the possession of the Trustee, and funding of reserves as provided in the Trust Agreement is not subject to the automatic stay pursuant to section 922(d) of the Bankruptcy Code, and that Defendants' failure to remit such

Revenues securing the Bonds for application to debt service during PREPA's Title III case

violates sections 922(d) and 928(a) of the Bankruptcy Code;

(b)      Declaring that capital improvements, capital expenditures, and all other

expenses that are not current and not reasonable and necessary for maintaining, repairing, or

operating the System in an efficient manner do not constitute "Current Expenses" under the Trust

Agreement or "necessary operating expenses" under section 928(b), are subordinate to payment

of debt service on the Bonds and the funding of certain reserves as provided under the Trust

Agreement and therefore may not be charged against Revenues prior to the payment of such debt

service and the funding of such reserves pursuant to Section 928(b) of the Bankruptcy Code;

(c)      Declaring that Defendants' withholding or use of Revenues for capital

expenditures, future expenses, and all other non-current expenses that are not reasonable and

necessary to operate or maintain the System in an efficient and economical manner violates

Plaintiffs' rights under the Takings Clause of the U.S. Constitution;

(d)      Declaring that Defendants' withholding or use of Revenues for capital

expenditures, future expenses, and all other non-current expenses that are not reasonable and

necessary to operate or maintain the System in an efficient and economical manner violates

Plaintiffs' rights under the Due Process Clause of the U.S. Constitution;

(e)      Enjoining Defendants from taking or causing to be taken any action that

would further violate sections 922(d) and 928(a) of the Bankruptcy Code as made applicable to

PREPA's Title III case by section 301 of PROMESA, including but not limited to enjoining

Defendants from using Revenues to pay for expenses that do not constitute "necessary operating

expenses" under section 928(b) prior to payment of debt service on the Bonds and the funding of

reserves as provided in the Trust Agreement;

(f)      Ordering Defendants to promptly and regularly remit Revenues securing the Bonds in accordance with sections 922(d) and 928(a) of the Bankruptcy Code,

(g)      Enjoining Defendants from using Revenues to fund capital expenses and all other expenses that are not reasonable and necessary to operate or maintain the System in an efficient and economical manner before PREPA complies with its obligations under section 507 of the Trust Agreement;

(h)      Ordering Defendants to submit each month to Plaintiffs and the Trustee reports that itemize each and every current operating expense that Defendants seek to prioritize over the Bonds, and the balances of each account created under the Trust Agreement; and

(i)      Granting Plaintiffs such other and further relief as this Court may deem just and proper.

Dated: August 7, 2017
    San Juan, Puerto Rico

**CASELLAS ALCOVER & BURGOS P.S.C.**  **CADWALADER, WICKERSHAM & TAFT LLP**

/s/ *Heriberto Burgos Pérez*       /s/ *Howard R. Hawkins, Jr.*
HERIBERTO BURGOS PÉREZ     HOWARD R. HAWKINS, JR.*
USDC-PR No. 204,809        MARK C. ELLENBERG*
RICARDO F. CASELLAS-SÁNCHEZ   NATHAN BULL**
USDC-PR No. 203,114        ELLEN HALSTEAD*
DIANA PÉREZ-SEDA        THOMAS J. CURTIN*
USDC–PR No. 232,014        CASEY J. SERVAIS*
P.O. Box 364924         200 Liberty Street
San Juan, PR  00936-4924      New York, New York 10281
Tel.: (787) 756-1400        Tel.: (212) 504-6000
Fax: (787) 756-1401        Fax: (212) 406-6666
E-mail: hburgos@cabprlaw.com    Email:  howard.hawkins@cwt.com
    rcasellas@cabprlaw.com      mark.ellenberg@cwt.com
    dperez@cabprlaw.com       nathan.bull@cwt.com
               ellen.halstead@cwt.com
*Counsel for Assured Guaranty Corp. and  Assured*  thomas.curtin@cwt.com
*Guaranty Municipal Corp.*       casey.servais@cwt.com

               *admitted *pro hac vice* in Nos. 17-03283-LTS, 17-04780-LTS
              **admitted *pro hac vice* in No. 17-04780-LTS

              *Counsel for Assured Guaranty Corp. and Assured*
              *Guaranty Municipal Corp.*

**TORO, COLÓN, MULLET, RIVERA & SIFRE, P.S.C.**

/s/ *Manuel Fernández-Bared*
MANUEL FERNÁNDEZ-BARED
USDC-PR No. 204,204
LINETTE FIGUEROA-TORRES
USDC-PR No. 227,104
NAYDA PEREZ-ROMAN
USDC–PR No. 300,208
P.O. Box 195383
San Juan, PR 00919-5383
Tel.: (787) 751-8999
Fax: (787) 763-7760
Email:  mfb@tcmrslaw.com
        lft@tcmrslaw.com
        nperez@tcmrslaw.com

*Counsel to the Ad Hoc Group of PREPA
Bondholders*


**ADSUAR MUNIZ GOYCO SEDA & PEREZ-OCHOA PSC**

/s/ *Eric Pérez-Ochoa*
ERIC PÉREZ-OCHOA
USDC-PR No. 206,314
LUIS A. OLIVER-FRATICELLI
USDC-PR NO. 209,204
208 Ponce de Leon Ave., Suite 1600
San Juan, PR 00936
Tel.: (787) 756-9000
Fax: (787) 756-9010
Email:  epo@amgprlaw.com
        loliver@amgprlaw.com

*Counsel for National Public Finance Guarantee
Corp.*


**KRAMER LEVIN NAFTALIS & FRANKEL LLP**

/s/ *Amy Caton*
THOMAS MOERS MAYER*
AMY CATON*
GREGORY A. HOROWITZ*
NATAN HAMERMAN*
ALICE J. BYOWITZ*
1177 Avenue of the Americas
New York, New York 10036
Tel.: (212) 715-9100
Fax: (212) 715-8000
Email:  tmayer@kramerlevin.com
        acaton@kramerlevin.com
        ghorowitz@kramerlevin.com
        nhamerman@kramerlevin.com
        abyowitz@kramerlevin.com

*admitted pro hac vice

*Counsel to the Ad Hoc Group of PREPA Bondholders*


**WEIL, GOTSHAL & MANGES LLP**

/s/ *Marcia Goldstein*
MARCIA GOLDSTEIN*
JONATHAN POLKES*
SALVATORE A. ROMANELLO*
GREGORY SILBERT*
767 Fifth Avenue
New York, New York 10153
Tel.: (212) 310-8000
Fax: (212) 310-8007

STEPHEN A. YOUNGMAN
200 Crescent Court, Suite 300
Dallas, Texas  75201-6950
Tel.: (214) 746-7700
Fax: (214) 746-7777
Email:  marcia.goldstein@weil.com
        jonathan.polkes@weil.com
        salvatore.romanello@weil.com
        gregory.silbert@weil.com
        stephen.youngman@weil.com

*admitted *pro hac vice* in No. 17-03283-LTS

*Counsel for National Public Finance Guarantee Corp.*

**GOLDMAN ANTONETTI & CORDOVA, LLC**

/s/ *Carlos A. Rodríguez-Vidal*
CARLOS A. RODRÍGUEZ-VIDAL
USDC-PR No. 201213
SOLYMAR CASTILLO-MORALES
USDC-PR NO. 218310
American International Plaza
250 Muñoz Rivera Avenue, Suite 1500
San Juan, PR 00918
Tel.: (787) 759-8000
Fax: (787) 767-9333
Email:  crodriguez-vidal@gaclaw.com
         scastillo@gaclaw.com

*Counsel for Syncora Guarantee Inc.*

**DEBEVOISE & PLIMPTON LLP**

/s/ *My Chi To*
MY CHI TO*
CRAIG A. BRUENS*
ELIE J. WORENKLEIN*
919 Third Avenue
New York, New York 10022
Tel.: (212) 909-6000
Fax: (212) 909-6836
Email:  mcto@debevoise.com
         cabruens@debevoise.com
         eworenklein@debevoise.com

*admitted *pro hac vice* in No. 17-03283-LTS

*Counsel for Syncora Guarantee Inc.*